**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**

SAE BIANG OPTICAL                                                                         PLAINTIFFS

AND

SUK JAE LEE

V.                                                                                                 NO. 3:05CV-00168-JDM

KENMARK OPTICAL, INC.                                                                      DEFENDANT

**MEMORANDUM OPINION**

This is a breach of contract action, in which the parties have filed cross motions for summary judgment (docket nos. 80 and 82) pursuant to FED. R. CIV. P. 56. The court has reviewed each motion, and all responses thereto. For the reasons stated below, the court will deny Kenmark's request for summary judgment on its counterclaims, because this court has determined that the contracts at issue were valid and enforceable. The court will also grant Sae Biang's and Mr. Lee's cross-motion for partial summary judgment on the issue of whether Kenmark properly repudiated the Agreements. With respect to the asserted damages, the court will deny Kenmark's request for partial summary judgment. The amount of damages should be limited both in terms of quantity and temporal scope, but not in the manner asserted by Kenmark.

**I.**

Sae Biang Optical and Suk Jae ("Thomas") Lee (collectively referred to herein as "Sae Biang") seek relief from Kenmark Optical, Inc. for its alleged breach of two contracts: a Distribution License Agreement and the License Agreement (collectively, the "Agreements"),

pursuant to which Kenmark had acquired the rights to sell and distribute both generic and branded versions of a type of magnetic clip-on eyewear developed and manufactured by Sae Biang and Mr. Lee. Kenmark quit purchasing and distributing the eyewear approximately five months after the contracts were executed, however, because it was served with a summons in a patent infringement suit not long after it first displayed the eyewear at a trade show. After consulting with its patent counsel, Kenmark settled the lawsuit, and notified Sae Biang that it was repudiating the Agreements. Approximately three years later, Sae Biang then filed suit to enforce the terms of the Agreements, and Kenmark counterclaimed, alleging principally that its performance should be excused because the sale and distribution of the Sae Biang eyewear would be patent infringement.[1]

After conducting discovery and other motion practice, Kenmark filed a motion for summary judgment, to which Sae Biang responded and included its own request for summary judgment. Kenmark asserts that the contracts are not enforceable because they failed to include a price term, or, alternatively, because they were the result of both parties' mutual mistake about, and Sae Biang's fraudulent misrepresentations regarding, the patent status of the eyewear. Kenmark also asserts that the amount of damages should be limited in terms of quantity (the amount of the initial purchase order) and temporal scope (only damages incurred before Kenmark repudiated the contracts).

Sae Biang, for its part, asserts that the court should dismiss Kenmark's counterclaims

---

[1]Kenmark also filed a third-party complaint against its former patent counsel and his law firm, whom Kenmark had hired to evaluate the validity of Sae Biang's patent rights before it executed the contracts. By separate memorandum opinions and orders, the court granted summary judgment in third-party defendants' favor on the single claim of negligence in the third-party complaint, and dismissed plaintiffs' single claim of tortious interference with contract. *See* docket nos. 91 and 93.

because the contracts are valid and enforceable in spite of the open price term, that Kenmark's repudiation was without justification, because the contracts only permitted Kenmark to escape its obligations if it *lost*, not settled, a patent infringement suit, and because there was neither any mutual mistake nor misrepresentation regarding the patent status of the eyewear.

## II.

It should be well known to all in the legal community by now, but it nonetheless bears repeating, that summary judgment as a matter of law is proper only where there exists no genuine issue of material fact. FED. R. CIV. P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue for the evaluating court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The proffered evidence must fit within certain parameters, however. It must be "of an evidentiary quality that demonstrates the existence of a genuine issue of material fact." *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997)(emphasis added). "The proffered evidence need not be in admissible form, but its content must be admissible." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)(emphasis in original omitted)).

The questions for this court are, broadly speaking, whether there exists a binding set of contracts, and, if so, whether Kenmark was entitled to repudiate them, and, if not, what damages should be awarded to Sae Biang. In their cross-motions for summary judgment, the parties spent unnecessary time arguing over whether Kentucky or New York law applied to this claims

alleged in this case. They have since wisely agreed that New York law governs[2] and, accordingly, the court will look to it when resolving the questions identified above.

**A.   Are the License Agreement and the Distribution License Agreements Enforceable Contracts?**

Kenmark advances two alternate arguments regarding whether the Agreements are binding contracts. It principally asserts that the Distribution License Agreement[3] is not an enforceable contract because there is no price term. As an alternative argument, it asserts that the Agreements are not enforceable because Sae Biang made a material misrepresentation of fact regarding the status of Sae Biang's patent for the eyewear.

**1.   The Open Price Term**

Because the Distribution License Agreement is for the sale of goods, it is governed by the Uniform Commercial Code, as adopted by the legislature of New York. *See* N.Y. U.C.C. LAW § 2-301, *et seq.*(McKinney 2007)(adopted in 1962). Pursuant to New York's Uniform Commercial Code, parties can create a binding contract for the sale of goods with an open price term, *"if they so intend"* N.Y. U.C.C. LAW § 2-305 (McKinney 2001)(emphasis added). "In

---

[2]*See* Distribution License Agreement § 17.7 (docket no. 80 at Ex. 1)(stipulating that New York law governs); License Agreement § 17.7 (docket no. 80 at Ex. 2)(also stipulating that New York law governs); Pl's Reply at 3 (docket no. 90)(conceding and stipulating that New York law governs); *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 243 n.8 (declaring that the receiving court of a case transferred pursuant to 28 U.S.C. § 1404(a) – as *Sae Biang v. Kenmark* was – must apply the choice of law rules of the state from which the case was transferred); *Welsbach Elec. Corp. v. MasTec North America,* Inc., 7 N.Y.3d 624, 627 (N.Y. 2006); and *Boss v. Am. Express Fin. Advisors, Inc.*, 15 A.D. 3d 306, 307 (N.Y. App. Div. 2005), *aff'd* 6 N.Y.3d 242 (N.Y. 2006),("It is the well-settled policy of the courts of this State to enforce contractual provisions for choice of law and selection of a forum for litigation."(internal quotations omitted)).

[3]Although Kenmark refers to the Agreements generally, as a practical matter, the real fight is about the Distribution License Agreement, by which Kenmark agreed to purchase a certain amount of magnetic clip-on eyewear manufactured by Sae Biang, and acquired the right to sell that eyewear. The License Agreement granted Kenmark the right to contract with others for the manufacture of and then sell Sae Biang's eyewear, but no minimum sales were required, nor any minimum royalty payments due.

such a case the price is a *reasonable* price at the time for delivery if [as is the case here] (a) nothing is said as to price ..." *Id.* (emphasis added).

Kenmark asserts that the parties did not intend for the Distribution License Agreement to be binding or enforceable absent a price term. This argument is not well-taken. To begin with, the Distribution License Agreement is lengthy and generally comprehensive (in spite of the lack of a price term), covering the term of the agreement, the licensed territory, minimum purchases, advertising and promotion, amount of royalties, inspections and audits, method of payment, quality control, and sourcing, among other issues. In addition, each was signed and dated by the parties' principals, over the statement "I have the authority to bind the corporation." Finally, and importantly, until Kenmark was sued for alleged patent infringement, it conducted its business as if the Distribution License Agreement was binding: it paid the deposit required by the Agreement, ordered an initial shipment, did not object to the price of that shipment, and negotiated and executed the License Agreement (as the Distribution License Agreement promised it the opportunity to do). Moreover, section 17.2 of the Distribution License Agreement contains the statement, "This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof ...." For Kenmark now to assert it did not intend to be bound by the Agreements absent a negotiated price term, is unpersuasive, at a minimum

**2.     Are the Agreements Invalid because of Fraud in the Inducement?**

Kenmark next asserts that the Agreements are invalid because Sae Biang made fraudulent representations regarding the patent status of the eyewear. Specifically, Kenmark claims that Sae Biang "misrepresented [its patent] rights [during contract negotiations], and had falsely declared that it had a patent pending, when in fact it had merely applied for patent protection."

-5-

*See* Kenmark's Mot. Summ. J. at 16 (docket no. 80). The essential elements of a claim of fraud under New York law are intentional misrepresentation of a material fact resulting in an injury. *See, e.g., Held v. Kaufman*, 91 N.Y.2d 425, 431 (N.Y. 1998). Kenmark cannot meet its burden of establishing all the elements. *Cf. id.* at 432 (the party alleging fraudulent misrepresentation has the burden of proof).

To begin with, the phrases "patent pending," or as reworded slightly in the Agreements, "pending patent," might sound like terms that carry significant legal import, but they essentially are meaningless. As the Federal Circuit (the federal court of appeals that has nationwide subject matter jurisdiction over patent issues) and many other courts have noted when commenting on the phrases' status as mere terms of art,

> A 'patent pending' notice gives one no knowledge whatsoever. It is not even a guarantee that an application has been filed. Filing an application is no guarantee that a patent will issue, and a very substantial percentage of applications will never result in patents. What the scope of claims in patents that do issue will be is something totally unforeseeable.

*E.g., State Indus., Inc. v. A.O. Smith Corp.,* 751 F.2d 1226, 1236 (Fed. Cir. 1985).

Technical terms and words of art are given their technical meaning when used in a transaction within their technical field, unless a different intention is manifested. *See* RESTATEMENT (SECOND) OF CONTRACTS § 202(3)(b)("Rules in Aid of Interpretation"); *cf. Matter of Riconda*, 90 N.Y.2d 733, 738 and 740 (N.Y. 1997)(referring to and rendering an opinion consistent with the RESTATEMENT (SECOND) OF CONTRACTS § 202). The court is aware of Kenmark's claims that Mr. Lee made certain allegedly false oral representations regarding the status of the patent application. (Apparently, it initially was rejected shortly before or during the contract negotiations, and then re-filed. The patent ultimately issued, however.)

Nevertheless, the express language of the Agreements (*see* § 8.1 of the Distribution License Agreement and § 7.1 of the License Agreement) put Kenmark on notice that it needed to investigate independently the validity of the patent status of the eyewear, and it did just that. Kenmark thus hired patent counsel, who purportedly investigated the patent claims and approved the execution of the Agreements. That counsel missed the existence of the patent held by Aspex, the company that sued Kenmark for patent infringement after it displayed the Sae Biang products at a trade show, but less than thorough legal advice by one party's counsel does not support a claim of fraud against the other party.

### 3. Are the Agreements Invalid Because of Mutual Mistake?

Kenmark also asserts that the Agreements should be deemed invalid because of a mutual mistake about whether the eyewear products legally could be sold within the assigned territory. The court cannot find any support for this argument, either. "A party bears the risk of a mistake when (a) the risk is allocated to him by agreement of the parties, or (b) he is aware, at the time the contract is made that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient." RESTATEMENT (SECOND) OF CONTRACTS § 154; *Koam Poduce, Inc. v. Dimare Homestead, Inc.,* 329 F.3d 123, 127-28 (2nd Cir. 2003)(citing applicable New York case law). The Agreements clearly assigned the risk of mistake about the legal status of the eyewear to Kenmark. Sections 7.1 of the Distribution License Agreement and 8.1 License Agreement, both state, "Licensee is responsible for obtaining independent legal advice with respect to the Eyewear Patent and whether it infringes any other patents owned by third parties." It is therefore clear that, even if there genuinely existed any mutual mistake regarding Kenmark's ability to legally sell the eyewear products

within its assigned territory, any risk attendant to that putative mistake lies squarely with

Kenmark.

**B.     Did Kenmark Validly Terminate the Agreements after it Settled the Patent Infringement Lawsuit?**

Given that the Agreements are enforceable contracts, the next question for the court is

whether Kenmark validly repudiated, or breached, them. The License Agreement and the

Distribution License Agreement each provide Kenmark with only one basis for repudiation.

Those Agreements state:

> 15.4 Licensee's Right to Terminate – In the event that Licensee *loses* any such suit as mentioned in 7.1 [or 8.1 (depending on the Agreement)], Licensee shall have the right to terminate this Agreement, but shall still be responsible for all obligations under Section 16.

(Agreements at § 15.4 (emphasis added)). Sections 7.1 (of the License Agreement) and 8.1 (of

the Distribution License Agreement state:

> 7.1 [or 8.1] Licensee is responsible for obtaining independent legal advice with respect to the Eyewear Patent and whether it infringes any other patents owned by third parties. It is further acknowledged that, regardless of good legal opinion, *there is a likelihood of malicious or nuisance suits in relation to the sale of Eyewear Products which use the Eyewear Patent*. The Licensor does not indemnify the Licensee in any way, save to co-operate with the Licensee in Supplying any technical evidence which may assist in the defense of such claims.

(License Agreement at § 7.1; Distribution License Agreement at § 8.1 (emphasis added)). Read

literally, the Agreements state that Kenmark's only has the right to terminate the Agreement if it

"loses" a "malicious or nuisance suit" for patent infringement with respect to the eyewear

products. Sae Biang asserts that this provision should be interpreted strictly and narrowly.

Kenmark asserts that such an interpretation is unreasonable and not what it understood when it

-8-

entered into the Agreements.

### 1. The Parol Evidence Rule

The parol evidence rule is a rule of substantive law that has two prongs: the first excludes admission and consideration of extrinsic evidence concerning the meaning of provisions of a written agreement if the meaning is complete, clear, and unambiguous on the face of the writing; the second excludes admission and consideration of extrinsic evidenced to create an ambiguity in writing that is otherwise complete, clear, and unambiguous on its face. *See, e.g., W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (N.Y. 1990) and *Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 599-600 (N.Y. 1997)(citing extensively to other cases); and *Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 451 (2nd Cir. 1977)(citing to New York law and noting that the parol evidence rule is a rule of substantive law). Moreover,

> Courts and commentators addressing the substantive procedural aspects of New York commercial litigation agree that the purpose of a general merger provision , typically containing the language ... that it "represents the entire understanding between the parties," is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing. The merger clause accomplishes this objective by establishing the parties' intent that the Agreement is to be considered a completely integrated writing. A completely integrated contract precludes extrinsic proof to add to or vary its terms.

*See, e.g., Lee*, 89 N.Y.2d at 599-600 (internal citations omitted). Both the Distribution License Agreement and the License agreement contain the same merger clause:

> This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof (and into which all prior negotiations, commitments, representations and undertakings of the parties are merged) and except as herein provided there are no other oral or written undertakings or agreements between the parties relating to the subject matter hereof.

*See* § 17.1 of each Agreement.  Pursuant to New York law, then, the parol evidence rule applies and the court must look within the four corners of the Agreements to determine whether Kenmark's repudiation of the Agreements fell within its termination rights under sections 15.4 of the Agreements.

      **2.**      **Did Kenmark "Lose" the Aspex Lawsuit?**

As noted above, if the Agreements are read literally and strictly, Kenmark had the right to terminate only if it "lost" a "malicious or nuisance" patent infringement suit.  *See* Distribution License Agreement at §§ 8.1 and 15.4 and License Agreement at §§ 7.1 and 15.4; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 202(2) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.")  One could argue that the Aspex lawsuit was neither malicious nor a nuisance suit, since Kenmark's patent counsel advised it that the Aspex's claims were valid and that it should promptly settle.  On the other hand, the patent for Sae Biang's eyewear products ultimately issued approximately four months after the contracts were executed and approximately two months after Kenmark was served with the Aspex lawsuit (*see* Patent Nos. 6,231,179 and 6,375,321, available for review online at www.uspto.gov), and the same counsel who advised Kenmark to promptly settle Aspex's lawsuit was the same counsel who completely missed the existence of the Aspex patent when asked to evaluate the "patentability" and patent status of the Sae Biang products.  Regardless, Kenmark did not "lose" the Aspex lawsuit within the ordinary meaning of that term; it settled.  The court's initial reaction is that the term "lose" is fairly straightforward and commonly understood, and in this context would indicate an unfavorable adjudication by a court.  To settle, on the other hand, is to reach a negotiated, non-judicial resolution.

Kenmark asserts that defeat was imminent, because Aspex's claims were valid, and therefore its decision to settle was the functional equivalent of a loss. Yet, where language has a generally prevailing meaning, it is interpreted in accordance with that meaning, unless a different intention is manifested. *See* RESTATEMENT (SECOND) OF CONTRACTS § 202(3). Among the various dictionaries that the court has consulted, including The American Heritage Dictionary and the Mirriam-Webster Online Dictionary to name just two, the applicable listed definitions of "lose" include minor variations on "to undergo defeat in" or "to fail to win," both of which imply that any defeat or failure was imposed upon the combatant, rather than the result of any calculated or otherwise rational choice. Nowhere among the published definitions reviewed by the court is included any variation on the following: "to agree to conclude or end a fight, whether or not defeat was reasonably certain, and regardless of whether concluding the fight might be the most economically efficient choice."[4]

The court will readily acknowledge that such a strict interpretation of the term "lose" might not be the most economically efficient, nor arguably even reasonable, when viewed from the perspective of an interpretation most likely to be employed by the average contracting party, and that it therefore would not likely form the basis for an "off-the-rack rule" crafted by a legislature. Kenmark and Sae Biang bargained at length for their own contract provisions, however, and when autonomous commercial entities bargain, they are entitled to bargain for any

---

[4]As an alternative argument, Kenmark asserts that, to the extent the term "lose" is ambiguous, it should be construed against Sae Biang, whom it asserts is the drafter of the agreement. Putting aside the factual issues surrounding whether Michael Jardine, who appears to have suggested a considerable amount of the Agreements' language, was or was not Sae Biang's agent, the court does not find the term "lose" to be sufficiently ambiguous to warrant the invocation of the rule of *contra proferentem. C.f. Giancontieri*, 77 N.Y.2d at 162 (declaring that whether a writing is ambiguous is a question of law to be determined by the court).

rational result, even if that result may not be the most sensible or economically efficient for the average contracting party.  Here, the contract language makes clear that Sae Biang perceived that the competitiveness of the eyewear industry gave rise to the likelihood of malicious or nuisance lawsuits regarding its products.  *See* § 7.1 of the License Agreement and § 8.1 of the Distribution License Agreement.  It therefore make sense that it would be concerned about one of its licensees folding its litigation tents too early,[5] and that it would want Kenmark to vigorously defend to their judicial resolution, rather than settle, any and all allegations of patent infringement to prevent an adverse decision from being part of the public record, particularly since the patent had not yet been issued at the time the Agreements were executed.  The court thus cannot say that a narrow interpretation of the word "loses" is an irrational or unreasonable result, even though it obviously works to Kenmark's detriment in this particular case, as the court concludes that the Agreements were valid and enforceable, and the facts do not support a finding that Kenmark's repudiation of the contracts was proper.  Rather, the facts support a finding that Kenmark breached the Agreements.

**C.     Should the Amount of Claimed Damages be Limited Temporally or Quantitatively?**

Kenmark asserts that Sae Biang's damages should be limited both in terms of their temporal scope and in terms of the amount claimed.  Kenmark is correct, but not to the extent or for the reasons it claims.

**1.     Temporal Limitation of Damages**

According to Kenmark, it properly repudiated the Agreements after it settled the patent

---

[5]The court notes that the patent for Sae Biang's products at issue in the Aspex lawsuit issued approximately two months after Kenmark was served with the lawsuit.

infringement suit filed by Aspex, and Sae Biang's alleged damages therefore should be temporally limited by the date of repudiation. The court has already determined, however, that Kenmark's invocation of sections 15.4 of the Agreements was not proper. Kenmark's argument with respect to a temporal limitation of damages therefore lacks merit. This is not to say, though, that a temporal limitation of Sae Biang's damages is not appropriate.

Both Agreements had initial three-year terms, and neither automatically renewed. To renew the Agreements, Kenmark was required to provide notice (*see* §§ 1.6, 4.1 and 4.2 of the Distribution License Agreement and §§ 1.6, 3.1 and 3.2 of the License Agreement) 180 days before the end of the initial term. There is no evidence in the record that Kenmark notified Sae Biang of its intent to renew, only evidence that it repudiated the contracts (albeit wrongfully). Neither Agreement gave Sae Biang the right to extend unilaterally the scope of the initial term, or to insist upon a renewal. Accordingly, Sae Biang is not entitled to any damages beyond those incurred during the initial three-term of the Agreements.

### 2.  **Quantitative Limitation of Damages**

Whether the amount of Sae Biang's damages should be limited requires more analysis. To begin with, the License Agreement and the Distribution License Agreement imposed different obligations on Kenmark, which affects the amount of damages Sae Biang is entitled to claim.

#### a.  **The License Agreement**

Pursuant to the License Agreement, Kenmark was granted the rights to contract for the manufacture of products utilizing Sae Biang's proprietary system of magnetic clip-on eyewear, and then to sell those products within a defined territory (*see* §§ 1.3 and 2.1). The License

Agreement required no minimum sales, nor any minimum royalty payment in the absence of sales (*see* License Agreement generally, and § 4.3 specifically). To the extent that Kenmark sold any such products during the initial term of the License Agreement, therefore, it owes Sae Biang a six percent royalty on those sales (*see* §§ 2.3 and 4.1), but there is no other contractual basis for awarding Sae Biang damages for Kenmark's improper repudiation of the License Agreement.

### b.    The Distribution License Agreement

Because the Distribution License Agreement was a contract for the sale of goods, Sae Biang's remedies and pursuant to New York's Uniform Commercial Code, particularly, sections 2-703, 2-706, 2-708 and 2-709). The court will schedule an evidentiary hearing to determine the precise amount of damages owed, but makes the following observations.

Unlike the License Agreement, the Distribution License Agreement imposed minimum purchase obligations on Kenmark (*see* § 2.4 of the Distribution License Agreement). Unless it validly repudiated the Distribution License Agreement, which it did not, Kenmark was contractually obligated to purchase an initial quantity of 60,000 of Sae Biang's "Eyewear Products" (as that term was defined in § 1.1 of the Distribution License Agreement) and to make a total purchase of 225,000 Eyewear Products during the initial three-year term of the Agreement. Kenmark is entitled to a credit in the amount of $50,000, for the deposit it paid pursuant to the Agreement (*see* § 2.6), however.

Because the parties did not specify a price in the Agreement, Sae Biang must present evidence of what a reasonable price at the time for delivery of the goods would have been at the time the delivery of the initial purchase order, and at various times in the contract. *See* N.Y.

U.C.C. § 2-305(1). Sae Biang should also be prepared to establish the amount of its incidental damages, if any, and is expected to provide a full and accurate accounting (the alleged and so-called "Arab traveler" cash sale notwithstanding) of its efforts to resell any of the "Eyewear Products," and of any expenses it saved as the result of Kenmark's breach.

Lastly, to the extent it actually sold any "Licensed Products" (as defined in § 1.4) Kenmark owes Sae Biang a six percent royalty (*see* §§ 3.2 and 5.1). Kenmark should therefore be prepared to provide evidence regarding the amount (or lack thereof) of any such sales.

The court will enter an order consistent with this memorandum opinion.

DATE:

cc: counsel of record