## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## AT LOUISVILLE

SAE BIANG OPTICAL                                                                            PLAINTIFFS

AND

SUK JAE LEE

V.                                                                                    NO. 3:05CV-00168-JDM

KENMARK OPTICAL, INC.                                                                        DEFENDANT

### MEMORANDUM OPINION

This is a breach of contract action, in which the parties have filed cross motions for summary judgment on the issue of damages with respect to contractually-required future orders (docket nos. 130 and 160) pursuant to FED. R. CIV. P. 56. The court has reviewed each motion, and all responses thereto, and heard oral argument of counsel in open court.

By prior memorandum opinion and order, the court determined that Kenmark Optical, Inc. breached two contracts in entered into with Sae Biang Optical. The damages resulting from breach of one of the contracts, a Disribution License Agreement, are at issue now. Pursuant to that agreement, Kenmark was contractually obligated to purchase an initial quantity of 59,600 of Sae Biang's eyewear products and to make a total purchase of 225,000 eyewear products during the initial three-year term of the Agreement. At the time of the breach, Sae Biang had completed 19,200 units of the initial order and had partially completed the remaining 38,400 units. The price was fixed at $13.00 for the initial order of 59,600 units, and Sae Biang was able

to sell approximately 40,600 units for almost $13.00 during the contract term,[1] so the calculation of damages for the initial order is not in serious dispute. Rather, the focus of both parties' motions for summary judgment is the damages due for the future orders of as yet unmanufactured units.

Both parties agree that New York Uniform Commercial Code § 2-708 governs Sae Biang's calculation of damages, but Sae Biang asserts that § 2-708(2) of that section should apply, whereas Kenmark asserts that the proper sub-section is § 2-708(1) is the appropriate measure for calculating Sae Biang's damages for the future orders. For the reasons stated herein, the court agrees with Kenmark. Accordingly, the court will grant Kenmark's motion for partial summary judgment and deny Sae Biang's.[2]

## I.

For efficiency's sake, the court incorporates by reference the more detailed factual background presented in its prior opinions and will only discuss the most salient points here. Sae Biang and Suk Jae ("Thomas") Lee (collectively referred to herein as "Sae Biang") entered into a contract with Kenmark pursuant to which Kenmark had acquired the rights to sell and distribute a type of magnetic clip-on eyewear developed and manufactured by Sae Biang and Mr. Lee.

---

[1] In its reply memorandum in support of its motion for summary judgment, and during oral argument, Sae Biang also stated that it was not seeking damages for the 34,000 partially-finished units that it had managed to sell to other customers during the contract term.

[2] Sae Biang's motion is entitled a motion for summary judgment, not a motion for partial summary judgment. In subsequent pleadings, however, Sae Biang stated that it would not seek damages for the 34,200 partially-finished goods, and the parties clarified during oral argument that there is no serious dispute regarding the damages due for the 19,200 finished goods. Accordingly, and regardless of its title, Sae Biang's motion is for partial summary judgment of the appropriate damages calculation for the future orders.

The contract required Kenmark to make an initial purchase of 59,600 units and to purchase an additional 165,400 units over the term of the contract. The contract specified a price of $13.00 per unit for the initial order, but contained no price term for the future orders, and specified no price floor. Kenmark made a deposit of $50,000, and accepted some samples for display at trade shows, but never accepted delivery of any of the initial order. Instead, Kenmark breached the contract approximately five months after it was executed, because it was served with a summons in a patent infringement suit not long after it first displayed samples of the eyewear at a trade show. After consulting with its patent counsel, Kenmark settled the lawsuit, and notified Sae Biang that it was repudiating the Agreements.

Pursuant to the terms of the contract, Kenmark was not entitled to terminate the agreement unless it "lost" a patent infringement lawsuit. This court has previously determined that Kenmark's decision to settle did not constitute a "loss" within the meaning of its contract with Sae Biang, and that Sae Biang was entitled to damages pursuant to New York's Uniform Commercial Code. The question at issue now is which subsection of that Code applies.

## II.

Because of the contractual peculiarities presented in this case, in which one party accepted the risk and burden of litigation directly affecting the marketability of the goods at issue, and the other party failed to account for that burden's potential effect on future negotiations for the price of the goods, there is no case law that provides firm guidance. The court will therefore evaluate the applicable statute in light of the goals of the Uniform Commercial Code: to simplify commercial transactions by promoting reasonable outcomes and eliminating uncertainty from commercial relationships.

New York's Uniform Commercial Code Section 2-708 (Seller's Damages for Non-acceptance or Repudiation) states:

> (1) Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (Section 2-723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (Section 2-710), but less expenses saved as a consequence of the buyer's breach.
>
> (2) If the measure of damages provided in subsection (1) *is inadequate* to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (Section 2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

N.Y.U.C.C. § 2-708 (emphasis added). Reduced to a quasi-mathematical formula, the first subsection can be represented as follows: DAMAGES = [(UNPAID CONTRACT PRICE) - (MARKET PRICE AT TIME & PLACE OF TENDER)] + (INCIDENTALS) - (EXPENSES SAVED). With respect to the future orders at issue in this case, however, there was no contract price. The parties had chosen to leave that term open.

Pursuant to New York's Uniform Commercial Code, parties can create a binding contract for the sale of goods with an open price term, *"if they so intend"* N.Y. U.C.C. LAW § 2-305 (McKinney 2001)(emphasis added). "In such a case the price is a *reasonable* price at the time for delivery if [as is the case here] (a) nothing is said as to price ..." *Id.* (emphasis added). Because the parties left open the price term, then, any calculation of damages under 2-708(1) would be as follows: DAMAGES = [(MARKET PRICE AT TIME & PLACE OF DELIVERY) - (MARKET PRICE AT TIME & PLACE OF TENDER) = ZERO] + (INCIDENTALS) - (EXPENSES SAVED). Obviously

-4-

the first two variables cancel each other out. Accordingly, Sae Biang asserts that subsection (1) is "inadequate" to put it in as good a position as performance of the contract would have done and, therefore, subsection (2) should apply. The court disagrees.

To begin with, the official commentary to § 2-708 states that subsection (2) was added to the original statute to close a loophole regarding the underlying goal of all contract damages law (to place the non-breaching party in as good a position as he would have been in had the contract been fully performed) by permitting "price actions" for "fixed price articles" in cases where resale was impractical. Accordingly, it has traditionally been used to prevent injustice in cases involving so-called "lost volume sellers." Although the parties have spent much time discussing whether Sae Biang should properly be considered a "lost volume seller," that issue is something of a red herring. The future orders governed by the contract were anything but "fixed price articles" at the time of Kenmark's breach.

In entering into the contract, Sae Biang agreed to an open price term. Evidence in the record indicates that Sae Biang wanted to preserve its option of demanding price increases, which makes sense, but it was too clever by half. It could have kept that option open, while still specifying a price floor. It did not. Accordingly, nothing in the contract would have prevented Kenmark from arguing for a price decrease, a demand that would have been altogether reasonable because of the uncertainty the patent litigation created.

Sae Biang now asserts that Kenmark's contractual obligation to defend the patent and to continue to purchase units until it "lost" an infringement suit essentially would have prevented it from arguing for a lower price on the future orders. The court disagrees. Both parties were savvy, sophisticated business people, and it strains credulity that any such person would have

-5-

paid full price for allegedly infringing goods.  How much of a discount Kenmark could have demanded in good faith would have, of course, depended on the legitimacy of Aspex's claims, but that does not mean that downward departures were contractually prohibited, just because Kenmark had assumed the burden of the patent's defense.

Because there was no fixed price, nor any specified delivery dates for the future orders, any determination of any putative "profit" to be gained from Kenmark's full performance, with all of the attendant complications related to the infringement suit and its effect on the market price at the time of tender or delivery, involves more speculation than should reasonably be permitted under the Code, which is designed to promote commercially reasonable certainty and to eliminate guesswork.  *See, e.g., Putnam Rolling Ladder Co., Inc. v. Manufacturers Hanover Trust, Co.*, 546 N.E.2d 904, 908 (N.Y. 1989).  Consequently, absent both a contractually fixed price and a reasonable means for calculating market prices, the underlying goal of contract law is better served in this matter by the application of § 2-708(1), by which the inherent uncertainties neatly cancel each other out, but do not prevent Sae Biang from being placed in the same position as it would have been had the contract been fully performed.

### III.

In failing to at least fix a price floor, Sae Biang's clever negotiation now works to its disadvantage.  Although the absence of a price term effectively removes the "business end" of the damages calculation in N.Y.U.C.C. § 2-708(1)(*i.e.,* the difference between the market price and the contract price), it nevertheless remains the appropriate measure of damages for Kenmark's breach, because the court concludes that "inadequate" means "legally inadequate" not "financially disappointing."

The court will enter an order consistent with this memorandum opinion.

DATE:   September 29, 2009

*James D. Moyer*
**James D. Moyer**
**United States Magistrate Judge**

cc:     counsel of record